JAMES K. CLELAND
*(Admitted Pro Hac Vice)*
**DICKINSON WRIGHT PLLC**
350 S. Main Street, Suite 300
Ann Arbor, MI 48104,
JCleland@dickinsonwright.com
Tel: 734-436-7356

FRANKLIN M. SMITH
*(Admitted Pro Hac Vice)*
**DICKINSON WRIGHT PLLC**
2600 W. Big Beaver Rd, Suite 300
Troy, Michigan 48084
FSmith@dickinsonwright.com,
Tel: 248-433-7393

Ryan Gile, Esq.
*rg@gilelawgroup.com*
Nevada Bar No. 8807
**GILE LAW GROUP LTD.**
1180 N. Town Center Drive, Suite 100
Las Vegas, NV 89144
Tel. (702) 703-7288

*Attorneys for Plaintiff/Counter-Defendant*
*Aim High Investment Group, LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| AIM HIGH INVESTMENT GROUP, LLC,<br><br>　　　Plaintiff/Counter-Defendant,<br><br>　　　v.<br><br>SPECTRUM LABORATORIES, LLC,<br><br>　　　Defendant/Counterclaimant. | **Case No. 2:22-cv-00158-GMN-DJA**<br><br>**PLAINTIFF'S**<br>**MOTION TO COMPEL** |



1

Plaintiff/Counter-Defendant AIM HIGH INVESTMENT GROUP, LLC ("Plaintiff" or "Aim High"), by and through its attorneys, and pursuant to Rule 37 of the Federal Rules of Civil Procedure and the Local Rules of this Court, hereby files this motion for an order compelling Defendant/Counterclaimant SPECTRUM LABORATORIES, LLC ("Defendant" or "Spectrum") to produce supplemental responses to Aim High's Interrogatory Nos. 2-6 and Requests for Production ("RFP") Nos. 2-6 directed to the factual basis for Spectrum's Counterclaims alleging patent infringement of the asserted '776 and '105 patents, and Spectrum's assertion that its product practices the asserted patents.

Pursuant to LR IA 1-3(f), and LR 26-6, Aim High's counsel has engaged in a meet-and-confer telephone conference with counsel for Spectrum in a good faith effort to resolve this dispute without court intervention, but an impasse was reached.

This Motion is made pursuant to Fed. R. Civ. P. 37(a) and based upon the Declaration of Franklin M. Smith, Esq., attached hereto as Exhibit 1 ("Smith Decl."), the Memorandum of Points and Authorities below and the exhibits attached hereto, the papers and pleadings on file herein, and any argument this Court may entertain at the time of a hearing on this matter.

Dated: December 30, 2022

Respectfully Submitted,

**DICKINSON WRIGHT PLLC**

*/s/ Franklin M. Smith*

JAMES K. CLELAND
*(Admitted Pro Hac Vice)*
350 S. Main Street, Suite 300
Ann Arbor, MI 48104,
JCleland@dickinsonwright.com
Tel: 734-436-7356

FRANKLIN M. SMITH
*(Admitted Pro Hac Vice)*
2600 W. Big Beaver Rd, Suite 300
Troy, Michigan 48084
FSmith@dickinsonwright.com,
Tel: 248-433-7393

**GILE LAW GROUP, LTD.**
Ryan Gile, Esq.
Nevada Bar No. 8807



**rg@gilelawgroup.com**
1180 N. Town Center Drive, Suite 100
Las Vegas, Nevada 89144
Tel. (702) 703-7288

*Attorney for Plaintiff/Counter-Defendant*
*Aim High Investment Group, LLC*



<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     INTRODUCTION**

This is a patent infringement case involving claims by Defendant/Counter-Plaintiff Spectrum Laboratories, Inc. ("Spectrum") that Plaintiff/Counter-Defendant Aim High Investment Group's ("Aim High") manufacture and sale of its *XStream* brand synthetic urine product infringes Spectrum's U.S. Patent Nos. 7,192,776 (the "'776 patent") and 9,128,105 (the "'105 patent") (together, the "Patents-in-Suit"). Aim High initially filed this action against Spectrum seeking declaratory relief of non-infringement and invalidity. Spectrum filed Counterclaims against Aim High for infringement of all claims of the '776 and '105 patents.

Each claim of the '776 and '105 patents requires a specific biocide selected from the list in the claims, and many of the claims of the '776 and 105 patents require that the amount of biocide is sufficient to "minimize sepsis." To support its Counterclaims, Spectrum included infringement charts relying on and citing to lengthy August 16, 2021 and September 7, 2021 reports containing testing and analysis performed by Element Laboratories on a sample of *XStream* (the "Element Labs Report"). The Element Labs Report allegedly detected a microscopic amount of biocide - 0.67 ppb (parts per billion). This, and a one-page report by another testing lab (S&N Labs), are Spectrum's only basis to support its Counterclaims allegation that Aim High's accused *XStream* product infringes the "biocide" claim limitations. Spectrum also relied on the Element Labs Report as the only basis in the Counterclaims for the presence of other chemical components or characteristics of Aim High's accused *XStream* product as well, including the presence of a disassociated ionic compound, and the specific gravity of the solution.

When Aim High issued its First Set of Interrogatories and First Set of Requests for Production of Documents to Spectrum including requests seeking, *inter alia*, discovery regarding the Element Labs and S&N Reports and testing, Spectrum reversed course and refused. Even though it had already relied on the Element Labs and S&N Reports, Spectrum flip-flopped to characterize the Element Labs and S&N Reports (and associated discovery) as "non-testifying expert discovery" protected by the work-product privilege - preventing Aim High from

1

discovering Spectrum's only facts, evidence and basis for its infringement Counterclaims. Spectrum asserted that Aim High cannot conduct any discovery into the Element Labs and S&N Reports and other testing reports until after Spectrum serves its expert reports (which are not currently due until March 20, 2023).

Spectrum cannot use the Element Labs and S&N testing as a sword to support its infringement Counterclaims, but now assert privilege as a shield to prevent Aim High from taking discovery into such proofs.  Spectrum waived any alleged privilege when it made the decision to rely on the Element Labs and S&N Reports to support its affirmative Counterclaims of infringement.  And the law is clear – Spectrum's waiver is a subject matter waiver.  Even if Spectrum backs away from relying on the report as its proof of infringement, Aim High is still entitled to take discovery surrounding Spectrum's only basis for maintaining its Counterclaims of patent infringement.

Aim High respectfully requests that the Court strike Spectrum's objections and order Spectrum to fully supplement its responses to Aim High's Interrogatories Nos. 2-6 and Aim High's Requests for Production Nos. 2-6.

## II.    FACTUAL BACKGROUND

### A.    Spectrum's Reliance on the Element Labs Report to Support its Infringement Counterclaims

Following threating correspondence from Spectrum and an exchange of pre-litigation correspondence, Aim High filed this action on January 28, 2022 seeking a declaratory judgment that its accused *XStream* product does not infringe Spectrum's '776 and '105 patents, and that '776 and '105 patents are invalid.  (ECF No. 1.)  Aim High alleged that *XStream* does not contain or add any of the claimed biocides, a key component of each claim of both the '776 and '105 patents.  (*Id*.)  In addition to answering Aim High's complaint, Spectrum filed Counterclaims on March 14, 2022, alleging that Aim High's *XStream* product infringes the '776 and '105 patents.  (ECF No. 7.)  To support its Counterclaims, Spectrum included infringement charts (ECF No. 7 at pp. 8-9)

relying on laboratory testing identified in Spectrum's October 11, 2021 letter to Aim High (Ex. 2). Spectrum's October 11, 2021 letter included the August 16, 2021 and September 2, 2021 Element Labs Reports (Ex. 2),[1] which allegedly confirmed prior testing by S&N Labs on Sept. 13, 2020 entitled "Revised Report of Analysis" (S&N Labs Report) (Ex. 16).  S&N Labs allegedly detected the biocide "methylisothiazolinone" (MIT) in an unreported amount (*id*.), and Element Labs allegedly detected MIT in a concentration of 0.67 ppb (parts per billion)(*See* Ex. 2 at page stamped AIMHIGH00406.)  The Element Labs Report also notes that the sample of *XStream* received for testing was "received with no foil seal."  (*Id*. at AIMHIGH00419.) Spectrum's          Counterclaim relied heavily on the Element Labs and S&N Reports, asserting that the Element Labs and S&N testing *proves* that Aim High's accused *XStream* product includes the claimed biocides, and sufficient biocide concentration to "minimize sepsis," required to infringe each claim of Spectrum's '776 and '105 patents.  For example:

> **Lab testing provided by Spectrum to Aim High on Oct. 11, 2021, proves** *XStream* has at least one biocide, namely methylisothiazolinone; and the concentrations of biocide relative to creatinine minimize sepsis as demonstrated at least by the product not spoiling on store shelves or elsewhere.
> . . .
> **Lab testing provided by Spectrum to Aim High on Oct. 11, 2021, proves** *XStream* has at least one of the claimed biocides, namely methylisothiazolinone, which is an isothiazolinone.

*See* Counterclaim (ECF No. 7) at pp. 8 - 9 (Claim Charts for '776 Patent and '105 Patent) (emphasis added).  The Element Labs and S&N Reports are Spectrum's sole basis for its biocide allegations. Indeed, Spectrum relies on these Reports as a basis to "prove" that the *XStream* product practices no less than eight (8) limitations of the first independent claim of both the '776 and '105 patents.

---

[1] Exhibit 2 is the Element Labs Report.  Spectrum previously filed the entire 134-page Element Labs report with the Court in this action without any request to seal.  (*See* ECF No. 25-8 (Ex. 7).) Although marked "Confidential", Exhibit 2 is no longer confidential.

DICKINSON WRIGHT
ATTORNEYS AT LAW

On May 13, 2022, the parties served initial disclosures.   Pursuant to Federal Rule 26(a)(1)(A)(ii), Spectrum identified both (i) the August 16, 2021 Element Laboratory Report and (ii) pre-litigation correspondence between the parties as documents Spectrum "believes in good faith that it may use to support its claims or defenses." (Ex 3, p. 3.)

Spectrum also used the Element Labs and S&N testing on its own website (https://urineluck.com/x-stream-and-quick-fix-lawsuit), as well as in unsolicited communications to third-party wholesale purchasers of laboratory-made synthetic urine products.   Spectrum publicly proclaimed that "**two different laboratories** have confirmed the presence of at least one of the biocides covered by Spectrum's patents" in an attempt to gain a market advantage.  (*See* Ex. 4, emphasis added.)

### B.   Aim High's Discovery Requests Seeking Element Labs and S&N Testing, Reports and Other Support for Its Infringement Allegations

On May 13, 2022, Aim High served its First Set of Interrogatories and its First Set of Requests for Production of Documents to Spectrum.[2] Aim High's Interrogatories 2-4 are directed to all testing, analysis or investigation of Aim High's accused *XStream* product, including the Element Labs and S&N Reports.  (*See* Ex. 5, pp. 2-4.)  Aim High's Document Requests 2-5 likewise seek documents related to all testing, analysis or investigation of Aim High's accused *XStream* product, including the Element Labs and S&N testing and reports.   (*See* Ex. 6, pp. 2-5.) Aim High's Interrogatories 5 and 6 are directed to the identity and concentration of the biocide used by Spectrum or others in any allegedly patented product (Ex. 5, pp. 4-5), and Aim High's Document Request 6 seeks testing related to same (Ex. 6, pp. 5-6).

---

[2] For efficiency and to reduce the number of exhibits, Aim High has only attached copies of Spectrum's discovery responses to Aim High's requests to this Motion since such responses incorporate Aim High's requests in their entirety.


DICKINSON WRIGHT
ATTORNEYS AT LAW

On June 13, 2022, Spectrum served objections/responses to Aim High's First Set of Interrogatories (*see* Ex. 5) and Aim High's First Requests for Production of Documents (*see* Ex. 6). Spectrum objected, and refused to provide answers to Aim High's interrogatories 2-4, or to produce any documents responsive to Aim High's RFPs 2-5. Spectrum claimed, for the first time, that the testing supporting its infringement Counterclaims was suddenly now protected by the work-product privilege of non-testifying experts pursuant to Fed. R. Civ. P. 26(b)(4). Spectrum has no other Rule 11 basis for its "biocide" infringement Counterclaims. For Interrogatories 5 and 6 and Document Request 6, Spectrum evaded the questions, instead including a generic recitation of all biocides recited in the '105 and '776 claims with no concentrations or testing. (Ex. 5, p. 5; Ex. 6, pp. 4-5.)

**C.     Aim High's Subpoena and Motion to Compel Element Labs**

In order to ensure it obtained all documents on the Element Labs side that may not have been received from or provided to Spectrum, on May 16, 2022, Aim High served a subpoena *duces tecum* on Element Labs seeking all documents and communications regarding its testing of Aim High's *XStream* product. (*See* Ex. 7.) On May 27, 2022, Spectrum's counsel in this case, representing Element Labs, served an objection letter stating that Element Labs is a non-testifying, consulting expert protected from discovery under Fed. R. Civ. P. 26(b)(4). (*See* Ex. 8.)

On July 20, 2022, Aim High filed a motion to compel Element Labs to provide documents responsive to the requests in its subpoena in the Central District of California. (*See* Ex. 9, excluding exhibits). On July 27, 2022, Spectrum filed its opposition to Aim High's motion. (*See* Ex. 10, excluding exhibits), and on August 2, 2022, Aim High filed its reply. (*See* Ex. 11.) In its briefing, Spectrum told the Court: "[T]here was no waiver by Spectrum because it disclosed the report during settlement talks—**not to prove infringement in this case**." (Ex. 10, p. 12)(emphasis added.) At the oral hearing, Spectrum repeated these blatant misrepresentations: "**[W]e're not**

**relying on those test results at this time offensively**." (Ex. 17, Hrg. Tr. at 23-24, emphasis added.)

On October 20, 2022, the California Magistrate Judge denied Aim High's motion to compel, finding that the Element Labs Report was privileged under Fed. R. Civ. P. 26(b)(4)(D) based on the erroneous conclusion that the Element Labs Report was produced only during "pre-litigation discussions." (Ex. 12 at pp. 1, 5, and 6.) The Magistrate Judge did not mention or even consider Spectrum's use of and reliance on the Element Labs and S&N Reports *to prove infringement* in its Counterclaims.[3] (*Id*.)

On November 3, 2022, Aim High filed an objection to the Magistrate Judge's ruling (*see* Ex. 13 (excluding exhibits)), and on November 14, 2022, Spectrum filed its response (*see* Ex. 14 (excluding exhibits)). The presiding District Court Judge did not summarily affirm the Magistrate Judge's ruling, but instead set an in-person hearing on Aim High's objections. As of the date of this Motion, the hearing on Aim High's objection has been pushed back twice and is currently scheduled for January 30, 2023.

**D.   Aim High's Attempts to Obtain Spectrum's Outstanding Discovery**

On November 11, 2022, Aim High wrote Spectrum detailing various discovery deficiencies in Spectrum's responses to Aim High's interrogatories and document requests. (*See* Ex. 15.) On November 29, 2022, counsel for the parties conducted a lengthy meet and confer to discuss Spectrum's responses to Aim High's discovery requests. The parties reached an impasse on Aim High's Interrogatories Nos. 2-6 and Requests for Production Nos. 2-6. (Ex. 18, pp. 2-3.) Spectrum maintained its position that the Element Labs and S&N Reports it relied upon as the sole Rule 11 basis to allege infringement of the '776 ad '105 patents are "undisclosed work-product," that

---

[3] The California Magistrate Judge's decision was also specific to Aim High's third party subpoena to Element Labs, whereas the current discovery dispute concerns party discovery.

Spectrum has not waived the alleged privilege, and that the parties should defer to the California court to rule on Aim High's current objection to the Magistrate Judge's subpoena ruling.  (*Id.*) Spectrum has also failed thus far to provide its or any third party biocides (Int. Nos. 5, 6), or any testing of its/third party products that Spectrum claims are covered by its patents (RFP No. 6).

## III.   LEGAL ARGUMENT

### A.   Legal Standard

Under Federal Rule 26(b)(1), a party may obtain discovery concerning any nonprivileged matter that is relevant to any party's claim or defense and is proportional to the needs of the case. Federal Rule of Civil Procedure 37(a)(3) permits parties to move to compel disclosure or discovery if the other party "fails to make a disclosure required by Rule 26(a)," "fails to answer an interrogatory submitted under Rule 33," or "fails to produce documents . . . as requested under Rule 34." *See Shuffle Master v. Progressive Games*, 170 F.R.D. 166, 170 (D. Nev. 1996).  "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

The purpose of discovery in civil actions is to remove surprise from trial preparation so the parties can obtain evidence necessary to evaluate and resolve their dispute; toward this end, procedural rules governing discovery are liberally interpreted to permit wide-ranging discovery of information even though the information may not be admissible at trial. *See U.S. ex rel. Schwartz v. TRW, Inc*., 211 F.R.D. 388, 392 (C.D. Cal. 2002) (quoted in *Igbinovia v. Catholic Healthcare West*, 2010 WL 5070881 (D. Nev. 2010) (unpublished)). In addition to discovering information pertaining to a party's case in chief, it is entirely proper to obtain information for other purposes such as cross-examination of adverse witnesses. *See Kerr v. United States District Court*, 511 F.2d 192, 196-97 (9th Cir. 1975), cert. granted 421 U.S. 987, aff'd 426 U.S. 394. When considering a motion to compel, the courts have broad discretion in determining relevancy for discovery

purposes. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005)

(citing *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002)).

    **B.**    **The Court Should Compel Spectrum to Respond to Aim High's Interrogatories 2-4 and Produce Documents in Response to Document Requests 2-5 Directed to Testing, Analysis and Investigation of Aim High's Accused *XStream* Product**

    Aim High has consistently taken the position since filing the Complaint that it cannot

infringe Spectrum's '776 and '105 patents because its *XStream* product does not contain, add or

include the claimed biocides required by every claim of the Asserted Patents.  Because Spectrum

produced testing reports from Element Labs and S&N Labs to support its infringement allegation

that Aim High's accused *XStream* product includes a biocide, Aim High sought discovery into

those and any other tests, analyses, or investigations of the accused *XStream* Product on behalf of

or at the direction of Spectrum:

> **INTERROGATORY NO. 2**
> Identify every third-party that conducted any kind of study, testing, analysis, or investigation of the XStream Product on behalf of and/or at the direction of Defendant.
>
> **INTERROGATORY NO. 3**
> For each study, testing, analysis, or investigation identified in response to Interrogatory No. 2, identify the documents that were reviewed, considered, or relied upon by the person(s) who conducted or participated in the study, testing, analysis, or investigation.
>
> **INTERROGATORY NO. 4**
> For each study, testing, analysis, or investigation identified in response to Interrogatory No. 2, identify and describe the results of the study, testing, analysis, or investigation (including dates and person(s) who conducted or participated).

Conceding relevance, Spectrum objected to each interrogatory based on work-product privilege,

alleging that testing and analysis performed by Element Labs and S&N Labs was protected as the

work of consulting experts pursuant to Fed. R. Civ. P. 26(b)(4)(D). Spectrum's Answer to

Interrogatory 2 below is representative, and repeated same false narrative that the Element Labs

and S&N testing was *not disclosed to prove infringement*:


DICKINSON WRIGHT
ATTORNEYS AT LAW

1

2

3

4

5

6

7

8

**ANSWER:** Spectrum objects to this interrogatory because it calls for information that is protected by the attorney-client privilege and/or work product doctrines. To the extent Spectrum engaged a third-party lab to test XStream, such labs would be consulting experts, and their work would be confidential work-product and not subject to discovery at this time. *See* Fed. R. Civ. P. 26(b)(4)(D) (barring discovery as to consulting experts). Subject to and without waiving that objection, as Aim High already knows, **Spectrum had testing done by Element Labs and S&N Labs, but their work was as consulting experts and their test results were disclosed by Spectrum to Aim High confidentially, <u>not to prove infringement</u>, but rather to facilitate FRE 408 settlement discussions between the parties**, and Spectrum has not yet decided what expert testing it will rely upon to prove infringement at trial and summary judgment. Spectrum will disclose the expert testing that it will rely upon to prove infringement at summary judgment or trial by the March 20, 2023 expert deadline for doing so.

9

10

(*See also* Ex. 5, pp. 3-4 for Spectrum's Answer to Interrogatories 3 and 4 lodging the same or very similar objections)(emphasis added).

11

12

13

14

Likewise, Aim High's Document Requests 2-5 seek documents related to the testing, analysis, or investigation of the accused *XStream* Product on behalf of or at the direction of Spectrum:

15

16

**REQUEST NO. 2**
All Documents, Information, and Communications relating to any laboratory testing conducted on the XStream Product.

17

18

19

**REQUEST NO. 3**
All Documents, Information and Communications between Defendant and Element (or any predecessor-in-interest, including (without limitation) Avomeen Analytical Services) relating to any protocols for testing, instructions regarding testing, or test results relating to the XStream Product.

20

21

22

**REQUEST NO. 4**
Documents sufficient to show the date of acquisition by Defendant or any of its representatives of each sample of the XStream Product acquired by Defendant or any of its representatives prior to the filing of the complaint.

23

24

25

**REQUEST NO. 5**
Documents sufficient to show the chain of custody for each sample of the XStream Product acquired by Defendant or any of its representatives which was used for laboratory testing.

26

27

28



Spectrum similarly objected to each document request based on work-product privilege pursuant to Fed. R. Civ. P. 26(b)(4)(D).      Spectrum's Answer to Document Request 2 below is representative:

> **RESPONSE:** Spectrum objects to this request because it seeks information subject to the attorney-client privilege and/or work product doctrine. To the extent such information exists, it would be work performed by consulting experts, and it therefore remains work-product and is not subject to discovery at this time. *See* Fed. R. Civ. P. 26(b)(4)(D) (barring discovery as to consulting experts); 26(b)(4)(A) (allowing depositions of testifying experts "only after the report is provided"). Moreover, this request is overly broad even as to testifying experts because it seeks information protected against disclosure under Fed. R. Civ. P. 26(b)(4). As a non-limiting example, it seeks draft reports and all communications with counsel regardless of subject matter, both of which are explicitly protected against disclosure. *See* Fed. R. Civ. P. 26(b)(4)(B), (C). After Spectrum designates its testifying expert by the March 20, 2023 expert disclosure deadline, Spectrum will conduct a reasonable and proportional search for responsive documents for that testifying expert, and will produce the documents that it finds in its possession, custody, or control, except for those documents entitled to work-product protection under Fed. R. Civ. P. 26(b)(4).

(*See also* Ex. 6, pp. 3-5 for Spectrum's Responses to RFPs 3, 4 and 5 lodging the same or very similar objections.)

### 1.    Spectrum Waived Any Claim to Privilege Because of Its Offensive Use of the Testing Reports to Support its Claims

Spectrum waived protection under work product immunity and/or Rule 26(b)(4)(D) by its intentional disclosure of, express reliance on, and offensive use of the Element Labs and S&N Reports.

Disclosure to an adverse party is, by its very nature, antithetical to a claim for privilege. *In re iPhone/iPad Application Consumer Priv. Litig.*, 2012 U.S. Dist. LEXIS 166711, 2012 WL 5897351, at *8 (N.D. Cal. Nov. 21, 2012).  "[C]ourts are in accord that the attorney work-product privilege is not absolute and may be waived, for example, when an attorney attempts to use the work-product as testimony or evidence, or reveals it to an adversary to gain an advantage in litigation." *City of Capitola v. Lexington Insurance Co.*, 2013 WL 1087491 at *1 (N.D. Cal. Mar. 13, 2013).  Waiver for the benefit of the party who owns the privilege precludes limiting the waiver

to avoid disclosing disadvantageous information. *Id.* Attempts to share only documents that support its position while withholding the remaining documents underlying that position or reflecting less advantageous information is impermissible. *Id.* A party "can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination." *United States v. Nobles*, 422 U.S. 225, 239-240 (1975).

District courts in the Ninth Circuit agree that a party's offensive use of non-testifying expert work-product to its advantage triggers waiver. *See In re iPhone/iPad Application Consumer Priv. Litig.*, 2012 U.S. Dist. LEXIS 166711, 2012 WL 5897351, at *8 (N.D. Cal. Nov. 21, 2012) (where the plaintiff actually attached a copy of an expert's report to their complaint, the court found that continued reliance upon the report for the plaintiff's theory in the case justified discovery); *Zeiger v. Wellpet LLC*, 2018 U.S. Dist. LEXIS 63019, 2018 WL 1011156 at *3 (N.D. Cal. April 10, 2018) (non-testifying expert privilege waived where plaintiffs explicitly alleged the results of an expert's testing in their complaint and relied on those results to overcome a motion to dismiss); *In re Morning Song Bird Food Litig*, 2015 U.S. Dist. LEXIS 11333, 2015 WL 12791470 at *7 (S.D. Cal Jan. 23, 2015) (work product protections waived because defendants voluntarily attached summaries of the consulting expert's assessment to their motion to dismiss the amended complaint); *Worley v. Avanquest N. Am. Inc*., No. C 12-04391 WHO (LB), 2013 WL 6576732, at *5 (N.D. Cal. Dec. 13, 2013) (compelling discovery because plaintiffs "very clearly rely upon their expert's investigation to support the claims in their First Amended Complaint" and no case law suggested "that the protections afforded by Rule 26(b)(4)(B) apply to an expert who has supplied statements, findings, or opinions explicitly relied upon by a party in a pleading or motion, rather than to the conventional instance who expert who [sic] merely provides behind-the-scenes

assistance to a party with respect to litigation"; "26(b)(4)(B) is rooted in fairness and that it would

be unfair to allow a party to use expert testimony as both a sword and a shield"); *Lexington*

*Luminance LLC v. Feit Elec. Co.*, No. CV 18-10513-PSG (KSx), 2020 U.S. Dist. LEXIS 255931,

at *28 (C.D. Cal. June 12, 2020)(granting a motion to compel patentee to disclose the pre-litigation

test results of the accused products that the patentee's non-testifying expert prepared because the

patentee put the analyses of the accused products "at issue" and waived any protections from

disclosure by publicly disclosing the factual analyses and conclusions in its complaint); *see also*

*Murray Southern Route Maritime, S.A.*, 2014 U.S. Dist. LEXIS 58852, 2014 WL 1671581 at *1

(W.D. Wash. Apr. 28, 2014) (finding no "persuasive reason why the non-testifying expert

privilege should be maintained despite a knowing and intelligent disclosure when virtually every

other privilege, including the attorney-client privilege and work product protections, are subject to

waiver.").

The facts here are at least as compelling. *First*, Spectrum's Counterclaim sets forth claim

charts that expressly cite the Element Labs and S&N Reports as Spectrum's sole basis for

**"proving"** that Aim High's *XStream* product infringes Spectrum's patents:

> **Lab testing provided by Spectrum to Aim High on Oct. 11, 2021, proves** *XStream* has at least one biocide, namely methylisothiazolinone; and the concentrations of biocide relative to creatinine minimize sepsis as demonstrated at least by the product not spoiling on store shelves or elsewhere.
> . . .
> **Lab testing provided by Spectrum to Aim High on Oct. 11, 2021, proves** *XStream* has at least one of the claimed biocides, namely methylisothiazolinone, which is an isothiazolinone.

*See* Counterclaim (ECF No. 7) at pp. 8 - 9 (Claim Charts for '776 and '105 Patents)(emphasis

added).  Like Spectrum's written and oral representations to the California Magistrate Judge,

Spectrum's objection to Interrogatory No. 2 that the "test results were disclosed by Spectrum to

Aim High confidentially, not to prove infringement, but rather to facilitate FRE 408 settlement

discussions between the parties" is false and should be rejected.  *Second*, Spectrum specifically listed the Element Labs and S&N Reports in its Rule 26(a)(1) initial disclosures as evidence it may rely upon to prove its claims and defenses.  (Ex. 3.)  Aim High is entitled to conduct discovery concerning that evidence to understand and probe Spectrum's basis for its claims.  *Third*, Spectrum uses the Element Labs and S&N Reports offensively on its website and in communications to customers and potential customers in an attempt to gain a market advantage:

> Two different laboratories have confirmed the presence of at least one of the biocides covered by Spectrum's U.S. Patent Nos. 7,192,776 and 9,128,105 in X-Stream. Based on that testing and other evidence, Spectrum believes X-Stream infringes both patents and expects to prove infringement in the new lawsuit.

(*See* Ex. 4.)(emphasis added).

There can be no question that Spectrum waived any privilege involving Element Labs and S&N testing and analysis of the accused *XStream* product.  The Court should strike Spectrum's objections, and order Spectrum to fully respond to Aim High's Interrogatories 2-4 and Document Requests 2-5.

> **2.    Spectrum's Subject Matter Waiver Encompasses All Communications and Information Concerning the Testing and Analysis of Aim High's Accused *XStream* Product**

Pursuant to Fed.R.Evid. 502(a), when a disclosure "made in a federal proceeding ... waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." *Theranos Inc. v. Fuisz Technolologies, Ltd.*, 2013 WL 2153276 at *1 (N.D. Cal. May 16, 2013) *citing to* Fed.R.Evid. 502(a).  "[A] subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a

selective and misleading presentation of evidence to the disadvantage of the adversary." *Id*. citing Fed.R.Evid. 502(a) Advisory Committee Note (2011).  In essence, "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield." *Id*. citing *Chevron Corp. v. Penzoil*, 974 F.2d 1156, 1162 (9th Cir.1992).

"The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter." *DealDash OYJ v. ContextLogic Inc.,* 2019 WL 1105317 at *2 (N.D. Cal. March 11, 2019) *citing Informatica Corp. v. Bus. Objects Data Integration, Inc.,* 454 F. Supp. 2d 957, 963 (N.D. Cal. 2006) *(quoting Fort James Corp. v. Solo Cup Co.,* 412 F.3d 1340, 1349 (Fed. Cir. 2005)), aff'd, No. C 02-3378 JSW, 2006 WL 2329460 (N.D. Cal. Aug. 9, 2006). The party asserting privilege bears the "burden to show that fairness does not require waiver of the privilege over documents relating to the same subject matter as the documents disclosed." *Id. citing Theranos,* 2013 WL 2153276 at *3. "Waiver for the benefit of the party who owns the privilege precludes limiting the waiver to avoid disclosing disadvantageous information." *City of Capitola*, 2013 WL 1087491 at *1.

Here, there can be no question that (1) Spectrum's waiver was made in a federal proceeding (e.g., Spectrum's Counterclaims), (2) Spectrum's waiver was intentional and (3) that Aim High's discovery requests seek the disclosed and undisclosed communications or information concerning the same subject matter of the Element Labs and S&N testing and reports.

They ought in fairness to be considered together in order to prevent Spectrum from a selective and misleading presentation of evidence to the disadvantage of Aim High.  Spectrum's limited offensive disclosures of Element and S&N's testing and analysis of Aim High's accused *XStream* product is only a partial, selective disclosure of information that Spectrum views as helpful.  Aim High's Interrogatories 2-4 and Document Requests 2-5 seek the rest in order to fairly

discover Spectrum's only Rule 11 basis for its Counterclaims alleging infringement. Indeed, if Spectrum performed or commissioned tests on Aim High's *XStream* product that did not detect a biocide, confirmed or questioned that the microscopic trace amount of biocide may actually be a false positive, or revealed some other non-infringing aspect, such tests would be highly relevant in disproving Spectrum's allegations and demonstrating Spectrum's lack of a good faith basis to assert claims of patent infringement. Aim High is entitled to know what documents or information was provided to Element and S&N to conduct their testing, what documents and information were received from Element and S&N, and what factual information, data, or assumptions may have been communicated to, reported by or relied on by the labs in testing *XStream*. Aim High is similarly entitled to know whether the testing labs performed additional tests that yielded different results. Aim High is entitled to discover the protocols for testing, instructions regarding testing, or test results relating to *XStream*. And Aim High is entitled to the details regarding sample handling, chain of custody and sample preservation, particularly in view of the Element Report's statement that the *XStream* sample tested was "received with no foil seal" raising the potential that the sample Spectrum provided was tampered with in a way designed to generate a biocide-positive reading.

Fairness demands subject matter disclosure of the requested documents, communication, and information underlying testing and analysis of Aim High's accused *XStream* product that Spectrum has placed front and center in this litigation. Spectrum's infringement Counterclaim is based solely on the testing and analyses by Element Labs and S&N Labs purporting to show the presence of specific biocides in Aim High's *XStream* product. Spectrum identified the Element Labs and S&N Labs Reports as documents it "may use to support its claims or defenses." Spectrum publicly disclosed on its own website and in third-party communications to wholesalers that "two different laboratories have confirmed the presence of at least one of the biocides covered

by Spectrum's patents" in support of Spectrum's position that Plaintiff's XStream product infringes Spectrum's U.S. Patent Nos. 7,192,776 and 9,128,105 in X-Stream." Compounding Spectrum's selective disclosure, Spectrum completely misrepresented the nature of its use of the Element Labs Report (1) to the Magistrate Judge in California, and (2) in its objection to Aim High's Interrogatory 2. Spectrum's other objections are also misleading, suggesting that it has not yet **elected whether to rely on the testing, when Spectrum already has relied on and offensively used those reports.**

District courts in the Ninth Circuit have found subject matter waiver on facts far less egregious. In the *City of Capitola*, the Court held that the voluntary disclosure of select consultant documents that tend to favor a party's position operates to waive any work product protection for remaining documents from that consultant that do not support the asserted position. 2013 WL 1087491, at *1-2. The Court reasoned that "[w]aiver for the benefit of the party who owns the privilege precludes limiting the waiver to avoid disclosing disadvantageous information." *Id*. Plaintiff's attempt to share only documents that support its position, or at least mitigate Defendant's, while withholding the remaining documents underlying that position or reflecting less advantageous information is impermissible. *Id*. at *1. Similarly in *Atari*, the Court rejected a party's attempt to limit the scope of waiver to a videotape voluntarily produced, but rather found subject matter waiver of any Rule 26(b)(4)(D) protections as to all matters related to formulation of the videotape. *Atari Corp. v. Sega of America*, 161 F.R.D. 417, 420 (N.D. Cal. 1994). The Court found that "Ninth Circuit authority counsels this Court to compel the production of the documents underlying the communications Mr. Stubben made in the videotape." *Id.; see also Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 237 F.R.D. 618, 626 (N.D. Cal. 2006) (disclosures to correct inventorship on patent application waived attorney-client privilege and work product protection as to subject matter of inventorship).

DICKINSON WRIGHT
ATTORNEYS AT LAW

Spectrum relied upon the Element Labs and S&N testing as its sword in asserting patent infringement claims against Aim High and cannot now rely upon privilege as a shield to prevent Aim High from pursuing relevant discovery into such testing. *See Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003)("The principle is often expressed in terms of preventing a party from using the privilege as both a shield and a sword . . . . In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials. The party asserting the claim is said to have implicitly waived the privilege.")[4]

### 3. This Court Should Not Wait for a Ruling From the California District Court on Aim High's Third Party Subpoena

While Spectrum contends that this Court should not consider the waiver issue until a decision by the Central District of California on Aim High's objections to the California Magistrate Judge's ruling on Aim High's subpoena on Element Labs, this Court should move forward. Spectrum's arguments to the California Magistrate Judge completely misrepresented to the court that "there was no waiver by Spectrum because it disclosed the report during settlement talks— not to prove infringement in this case" (Ex. 10 p. 15) even though Spectrum had already set forth

---

[4] "Exceptional circumstances" also exist to compel disclosure of the requested documents, communication, and information underlying the voluntarily disclosed testing results from Element Labs and S&N Labs because Spectrum put the lab testing and analyses of these "non-testifying experts" at issue. Fed. R. Civ. P. 26(b)(4)(D)(ii). The entire factual premises upon which Spectrum's good faith basis for claiming in its Counterclaim that Aim High's *XStream* product infringes Spectrum patents is the testing and analyses by Element Labs and S&N Labs purporting to show the presence of specific biocides in *XStream*. Aim High has no practicable alternative to discovering the requested documents, communication, and information underlying the voluntarily disclosed testing results from Element because that discovery is unique to the Spectrum. *Wells Fargo Bank, N.A. v. ANC Vista I, LLC*, No. 2:14-cv-00840-JCM-NJK, 2015 U.S. Dist. LEXIS 17566, at *5-6 (D. Nev. Feb. 11, 2015)("Rule 26(b)(4)(D) 'is not an impenetrable fortress against discovery and parties seeking discovery can make a showing of exceptional circumstances when there is no practicable alternative by which they can obtain the information.'")

DW
DICKINSON WRIGHT
ATTORNEYS AT LAW

1   the Element Report in its own Counterclaim in this case to "prove" that the *XStream* product met

2   the elements of the claim.

3       The Magistrate Judge's Order clearly indicates she only considered Spectrum's disclosure

4   of the Element Report to have been a pre-litigation disclosure during settlement talks – effectively

5   accepting Spectrum's representation – and that she had not accounted for Spectrum's express

6

7   reliance upon the Element Report in Spectrum's Counterclaims for patent infringement:

8       Given the circumstances giving rise to the partial disclosure of S&N and Element's
9       testing, the Court finds fairness does not justify a waiver protection under Rule
        26(b)(4)(D). . . . After receiving S&N's results, Aim High questioned the validity
10      of the results and suggested that Aim High test XStream again. In response,
        Spectrum Labs produced Element's test results. **It would belie fairness to allow**
11      **Aim High to benefit from obtaining all records pertaining to S&N and**
        **Element's testing after Aim High induced Spectrum Labs into producing**
12      **evidence to support its claim of infringement during pre-litigation discussions**.
        Disclosure under these circumstances would violate the very purpose of Rule
13      26(b)(4)(D).

14  (*See* Exhibit 12 at page 6 (emphasis added).)

15      Moreover, the Magistrate's decision (and Spectrum's opposition) ignored *Lexington*

16  *Luminance LLC v. Feit Elec. Co.*, No. CV 18-10513-PSG (KSx), 2020 U.S. Dist. LEXIS 255931,

17  at *28 (C.D. Cal. June 12, 2020), where the Court found waiver of consulting expert work product

18  pursuant to Rule 26(b)(4)(D) because the Plaintiff used expert testing in its first amended

19  complaint.  In this case, Spectrum has undeniably used the Element Labs and S&N Labs testing to

20  its advantage in this litigation – serving as Spectrum's sole Rule 11 good faith basis for setting

21  forth the proof of infringement in Spectrum's Counterclaim.

22

23  C.   **Aim High's Discovery Requests Directed to Testing of Other Products**
         **Covered by Asserted Patents - Interrogatories 5-6 and RFP 6**
24

25      Given that all the claims of Spectrum's Asserted Patents require a claimed biocide, and

26  that some claims require sufficient biocide to "minimize sepsis," Aim High posed interrogatories

27  and document requests directed to seeking information on the biocide identity and concentration

28  in products that Spectrum believes practices the invention, including its own Quick Fix product:

**DW**
DICKINSON WRIGHT
ATTORNEYS AT LAW

1

**INTERROGATORY NO. 5**

2
Identify the biocide(s) that is and/or has been used in any product that Defendant maintains practices the invention of the Patents-in-Dispute, including Defendant's product Quick Fix, since 2007 to the present.

3

4

**INTERROGATORY NO. 6**

5
For each biocide listed in response to Interrogatory No. 5, identify the concentration level of that biocide (measured in ppb) used in any product that
Defendant maintains practices the invention of the Patents-in-Dispute, including Defendant's product Quick Fix, since 2007 to the present.

6

7

**REQUEST NO. 6**

8
All Documents, Information, and Communications relating to any laboratory testing conducted by Defendant on any other third-party synthetic urine products that Defendant maintains practices or infringes the Patents-in-Dispute.

9

10

Spectrum objected to these requests as irrelevant and seeking work product materials

11

prepared in anticipated of litigation or trial. (*See*, Ex. 5, pp. 4-5; Ex. 6, p. 5-6.)  At the parties' meet

12

and confer, Spectrum promised to supplement its response to Interrogatory 5 with the biocide(s)

13

in its Quick Fix product, and contends it does not know the concentration.  Spectrum also promised

14

to provide testing disclosed in the Dr. Green's case, but refused to provide any other testing.[5]  If

15

16
Spectrum follows through on its promises, Spectrum's responses are still incomplete as they fail

17
to encompass the identity of biocides in other third party synthetic urine products, the

18
concentration of the biocides in those products, and testing of those third party products that

19
Spectrum alleges are covered by the asserted '776 and '105 patents.

20

21
As for relevancy, the relevancy requirement "has been construed broadly to encompass any

22
matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that

23
is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). An

24
objecting party must specifically detail the reasons why each request is irrelevant. *See, e.g.,*

25

26

27
[5] Spectrum initially agreed to provide supplemental responses and Dr. Green's testing documents by December 16, 2022.  As of the date of this motion, Spectrum has not done so.  Aim High reserves its right to pursue that information via this motion should Spectrum decline or fail to provide it.

28



*Painters Joint Comm. v. Employee Painters Trust Health & Welfare Fund*, No. 2:10-CV-01385-JCM, 2011 WL 4573349, at *5 (D. Nev. Sept. 29, 2011), order corrected on reconsideration sub nom. *Painters Joint Comm. v. JL. Wallco, Inc*., No. 2:10-CV-1385-JCM-PAL, 2011 WL 5854714 (D. Nev. Nov. 21, 2011).

Aim High's discovery requests call for information highly relevant to this case. The identity and concentration of biocides in synthetic urine products are central to the patents and Spectrum's claims. Spectrum presumably performed tests on its own Quick Fix synthetic urine product in order to make the claim that it practices the '776 and '105 patents, including that it contains a biocide sufficient to minimize sepsis. Spectrum has filed patent infringement lawsuits asserted one or both of the asserted '776 and '105 patents against other synthetic urine product manufacturers. Spectrum must have performed testing of those products to determine, at the very least, the identity and concentration of the biocide. See, for instance, Spectrum's website again for Spectrum's claim that lab testing showed Dr. Green's Agent X product contained a claimed biocide:

> The consequences of selling infringing products can be seen in our successful case in the U.S. District Court, Southern District of California: <u>*Dr. Greens, Inc. v. Spectrum Laboratories*</u>. The result… Dr. Greens, the maker of Agent X synthetic urine, owes Spectrum Labs nearly 4-million dollars based on lab testing that showed Agent X had one of the biocides covered by Spectrum's patents.

(Ex. 4.) Tests performed or commissioned by Spectrum of its own or any third party synthetic urine products to determine the presence and/or concentration of a biocide are relevant to demonstrate the level of biocide concentration that Spectrum alleges "minimize sepsis" and infringes Spectrum's Asserted Patents. Aim High is entitled to assess and compare those biocides and concentrations to the trace amount of biocide (0.67 ppb) that was supposedly detected in Aim High's accused *XStream* product by Element Labs.



**IV.   CONCLUSION**

For the reasons stated above, Aim High respectfully requests that the Court grant its motion, and compel Spectrum to:

(1)      strike Spectrum's objections and provide complete responses to Interrogatory Nos. 2-6, and

(2)      strike Spectrum's objections and provide all documents responsive to Aim High's Request for Production Nos. 2-6.

Dated: December 30, 2022

Respectfully Submitted,

**DICKINSON WRIGHT PLLC**

*/s/ Franklin M. Smith*

**DICKINSON WRIGHT PLLC**
JAMES K. CLELAND
*(Admitted Pro Hac Vice)*
350 S. Main Street, Suite 300
Ann Arbor, MI 48104,
JCleland@dickinsonwright.com
Tel: 734-436-7356

FRANKLIN M. SMITH
*(Admitted Pro Hac Vice)*
2600 W. Big Beaver Rd, Suite 300
Troy, Michigan 48084
FSmith@dickinsonwright.com,
Tel: 248-433-7393

**GILE LAW GROUP, LTD.**

Ryan Gile, Esq.
Nevada Bar No. 8807
***rg@gilelawgroup.com***
1180 N. Town Center Drive, Suite 100
Las Vegas, Nevada 89144
Tel. (702) 703-7288

*Attorney for Plaintiff/Counter-Defendant*
*Aim High Investment Group,  LLC*

1

## <u>CERTIFICATE OF SERVICE</u>

2
1.          I hereby certify that on December 30, 2022, I electronically filed the foregoing

3
document with the Clerk of the Court using CM/ECF.  I further certify that a true and correct

4
copy of the foregoing document is being served via transmission of Notices of Electronic Filing

5
generated by CM/ECF to all participants in the case who are registered CM/ECF users.

6

7
                                        */s/ Dawn Solis*
                                        Employee, Dickinson Wright PLLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



22